**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEBORAH COYLE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. H – 04 – 0244** |
| | § | |
| **JOHN W. SNOW, SECRETARY OF THE** | § | |
| **TREASURY,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

This case arises from Plaintiff's hostile work environment and retaliation claims under Title VII.  Defendant now moves for summary judgment, arguing that Plaintiff's claims are unsupported by the evidence and without merit.  For the reasons set forth below, Defendant's Motion for Summary Judgment (Docket # 19) is **GRANTED**.

## I. BACKGROUND

### A. Procedural History

Plaintiff began working for the Internal Revenue Service ("Agency") in 1981, as a Revenue Agent.  In 1986, Plaintiff became a Supervisory Revenue Agent, a position she then held for approximately fifteen years.  Plaintiff worked full-time for a number of years before changing to a part-time schedule.  She had been working part-time for approximately ten years when the Agency went through a reorganization process, in October 2000.  As part of the reorganization, a new supervisor, Martin Arnold ("Arnold") assumed supervisory duties over the division to which Plaintiff was assigned and became Plaintiff's supervisor.  This supervisory change marks the

beginning of a series of events that Plaintiff claims were retaliatory and created a hostile work environment.

Plaintiff claims that she first raised concerns about Arnold's allegedly discriminatory actions to his supervisors in June 2001.  In August 2001, Plaintiff contacted an EEO counselor, and in December 2001, she filed a formal administrative complaint.  Plaintiff alleged that Arnold had subjected her to a hostile working environment based upon her gender and by holding her to a different standard than he did male managers with respect to tour of duty and scheduling issues. Plaintiff later added retaliation to her complaint as a basis for subsequent actions by the Agency. Plaintiff's claim was assigned to an administrative judge ("A.J.") for resolution.  The A.J. conducted an evidentiary hearing of Plaintiff's complaints on January 7-9, January 31, and March 5, 2003, in which she heard testimony from twenty-seven witnesses.  On September 30, 2003, the A.J. issued a detailed decision, in which she evaluated Plaintiff's claims and found that Plaintiff had not shown that discrimination or retaliation had occurred.  Plaintiff subsequently filed this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, stating claims for hostile work environment on account of gender, and retaliation for prior EEOC activity.

**B. Hostile Work Environment Allegations**

Plaintiff alleges that Arnold used abusive language and yelled at her on a number of occasions.  Plaintiff also alleges that Arnold accused her of being insubordinate because she had failed to call him as he had requested in an email, which, Plaintiff claims, he never sent.  Plaintiff claims that Arnold also threatened two other female manages with being insubordinate.  Plaintiff asserts that Arnold never used abusive language or yelled at his male subordinate managers, nor did he ever threaten male manages with being insubordinate.  Additionally, Plaintiff alleges that Arnold denied or delayed making decisions on her requests to change her duty hours, while also denying several of her requests for credit hours and requiring her to obtain advance approval for

the earning and use of credit hours.  Plaintiff states that Arnold required her to advise him of what work she would accomplish prior to giving her approval for credit hours.  Plaintiff claims that Arnold allowed male managers to make changes to their duty hours when requested, allowed male mangers to earn credit hours without advance request or informing him of what work they planned to accomplish, and allowed male managers to earn more credit hours than Plaintiff.

**C. Retaliation Allegations**

Plaintiff alleges that on September 6, 2001, she informed Arnold of the informal EEO complaint that she had filed several days prior.  The next day, on September 7, 2001, Arnold denied her request to work flexi-place (work from home) on a specific project and also referred her to the Treasury Inspector General for Tax Administration ("TIGTA") for time and attendance violations.  Plaintiff alleges that Arnold had never denied any other manager's request to work from home on a particular project, and that when two other female employees had committed time and attendance violations, Arnold had discussed the issues with them and did not report them to the TIGTA.

On October 17, 2001, Plaintiff alleges that Arnold prepared an inaccurate Form 6850 performance appraisal for her, converting her ratings of "outstanding" on the previous year's appraisal to a lower overall rating of "meets" or "fully successful."  Arnold later changed her rating to "exceeds fully successful," after being advised by the Agency's personnel staff that this was the lowest he could give her, based on her previous "outstanding" rating.  On October 19, 2001, Plaintiff alleges that Arnold lowered her annual performance appraisal by two levels, from the previous year's "outstanding" rating to a "fully successful" rating.  She alleges that when he previously performed her mid-year progress review, on April 5, 2001, he had informed her that he was very pleased with her performance to date, and he had conducted no other reviews of her work in the intervening months.

3

Plaintiff also claims that, despite Arnold's awareness that she had worked part-time for many years, and that she was unable to work in a full-time position, Arnold notified her by voice mail on October 27, 2001 that he had decided to return her position to a full-time schedule, effective December 2, 2001.  Plaintiff alleges that Arnold knew that she would have to take a lower-level, non-supervisory position in order to continue working part-time.  Previously, on August 13, 2001, Arnold had mentioned to Plaintiff in an email that he expected her to return to full-time status when her group was fully staffed with new hires.  Plaintiff alleges that Arnold had learned as early as September 2001 that the hiring initiative had been delayed until June 2002. Plaintiff further alleges that Arnold denied her request to delay the conversion of her position to full-time until after the holidays, which required her to use more of her leave than if she had remained in part-time status until after the holidays.  Arnold made no effort to assist Plaintiff in locating or obtaining another part-time management position within the Agency.

Finally, Plaintiff alleges that while Arnold approved her request to take a combination of credit hours, annual leave, and Leave Without Pay ("LWOP") to care for her children during the week of December 3-7, 2001, he later reversed another manager's approval of her LWOP request covering the week of December 10-14, 2001.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law, based on the evidence thus far presented.  *See* Fed. R. Civ. P. 56(c).  "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th

Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id*.

"[A] complete failure of proof concerning an essential element of [Plaintiff's] case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for Defendant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If Defendant shows that there is a lack of evidence to support Plaintiff's case, Plaintiff "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Kee*, 247 F.3d at 210 (quotation omitted).   Plaintiff cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

## B. Hostile Work Environment

In order to establish a hostile work environment claim, Plaintiff must show that: (1) she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on gender; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that her employer knew or should have known of the harassment and failed to take remedial action.  *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999).  To succeed on her claim, Plaintiff must show that the harassment was severe or pervasive, and that it destroyed her opportunity to succeed in the workplace.  *Shepherd*, 168 F.3d at 874.  Plaintiff must also show that the harassment created an objectively hostile work environment, which a reasonable person would find hostile or abusive.  *Septimus*, 399 F.3d at 611; *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000).  The determination of whether a hostile environment existed should be based on all of

the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walker*, 214 F.3d at 625 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  Here, Defendant asserts that Plaintiff has failed to prove that Arnold's behavior was causally connected to her gender, that Arnold's behavior was severe or pervasive enough to make her work environment objectively hostile, or that his behavior affected a term, condition, or privilege of her employment or destroyed her opportunity to succeed in the workplace.

The Court agrees that Plaintiff has failed to show that any of Arnold's behavior was causally linked to her gender.  With respect to Arnold's yelling and abusive language, the evidence presented at the administrative hearing, which is cited in the A.J.'s decision, and of which Plaintiff has submitted excerpts to the Court, demonstrates that Arnold yelled at both female and male employees.[1]  Plaintiff testified that Arnold became angry and yelled at her on a number of occasions.  Administrative Decision ("A.D.") at 6; Pl.'s Ex. 2.  Similarly, female employees Patricia Booker, Lynne Langdale, and Pamela Bean described incidents in which Arnold had become angry and yelled at them.  Pl.'s Exs. 3-5; A.D. at 7-8.  However, male employees also testified that Arnold had yelled or raised his voice at them.  Charles White testified that while he would not call it yelling, Arnold had raised his voice to him.  Pl.'s Ex. 7.  James "Al" Gibson testified that he felt that Arnold yelled at him on the phone sometimes and that Arnold would become disproportionately angry and abusive.  A.D. at 10.  Gibson described how he had learned not to question Arnold after an occasion in the summer of 2000, in which Arnold had

---

[1] The Court may consider the evidence presented at the administrative hearing, as well as the A.J.'s decision.  *See, e.g.*, *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo.").  In this case, the Court must look to the A.J.'s decision and its citation of the evidence presented at the administrative hearing, as this comprises almost the entirety of the evidence produced.

yelled at him.[2]  A.D. at 10.  Additionally, other female employees testified that Arnold had not ever yelled or been abusive to them, and one testified that she felt Arnold to be more aggressive with males than with females.  A.D. at 7, 10-11.

Also notable are the A.J.'s conclusions that Plaintiff failed to show that she had been treated differently from those outside her protected group, and that Arnold created the same type of harsh environment for both his female and male subordinates:

> [Plaintiff] certainly showed that Arnold was not pleasant to work for and could be harsh and non-responsive to her concerns; however, the overall evidence shows that he created the same type of environment not only with females, but with his male subordinates.  The testimony reveals that he raised his voice and yelled at the males as well as the females.  [Plaintiff], Langdale and Booker did describe Arnold's actions in more vivid terms than some of the other witnesses, but it is noteworthy that there were other women who along with the men did not describe Arnold as out of control, enraged or threatening.  This fact makes it appear that it was the particular situations with these three individuals – not their sex – which was the basis of the confrontations between Arnold and them.

A.D. at 13.  Plaintiff has not produced any evidence to contradict testimony that Arnold yelled at employees of both sexes, or to contradict testimony showing that Arnold's anger and yelling was based on particular situations and personality conflicts, rather than on an employee's gender. Likewise, while she asserts in her Complaint that Arnold had threatened her and two other female managers with being insubordinate, she has failed to support this contention with evidence or even provide the identities of the two other female managers who Arnold allegedly threatened.  Plaintiff has failed to raise a genuine issue of fact as to any causal connection between Arnold's behavior and her gender.

---

[2] Plaintiff claims that Gibson's testimony that Arnold had yelled at him is contradicted by a sworn affidavit that Gibson gave during the formal investigative stage of Plaintiff's EEO complaint.  In support of this contention, Plaintiff has attached a page from what she alleges to be an affidavit executed by Gibson.  Pl.'s Ex. 6.  The document does indicate that the witness did not recall hearing Arnold raise his voice, though Arnold had expressed some frustration or irritation toward the witness.  *Id.*  Because Plaintiff attached only one page from a multiple-page affidavit, however, it is impossible to verify whose testimony it contains, whether the testimony was properly sworn, and in what context the statements were made.

Plaintiff has similarly failed to support her contention that Arnold's treatment of her duty hours and credit hours requests were linked to her gender.  Because Plaintiff has not submitted evidence relating to duty hours or credit hours requests, the Court looks to the administrative decision for support for Plaintiff's claims.[3]  Plaintiff testified at the hearing that Arnold required her to have her credit hours approved in advance.  A.D. at 24.  However, the testimony of other witnesses indicates that Arnold required all of his subordinates, including males, to obtain advance approval for credit hours.  In particular, Charles White testified that he was always required to request credit hours in advance.  A.D. at 29.  Plaintiff's own testimony shows that when Arnold denied her requests for credit hours that she had worked, he indicated that they had not been requested and approved in advance, as was his policy.  A.D. at 24-25.  Plaintiff is correct that, while Arnold required her to inform him of what work she would be doing during her credit hours, he did not impose the same requirements on White or Gibson.  A.D. at 24, 30.  It appears, however, that some employees had to inform their supervisors of what they were doing during credit hours, while others did not.  A.D. at 36.  Plaintiff has failed to show that this distinction was caused by, or even correlated to, her gender.

With respect to changes in her duty hours, Plaintiff testified to Arnold's inflexibility with her tour of duty and his insistence that she add thirty minutes to her duty hours for a lunch break.  A.D. at 24.  Plaintiff testified that, while Arnold became angry at her requests to change her duty hours at the beginning of the summer and again in the fall, to accommodate her school-aged children, he ultimately allowed her requested changes.  A.D. at 25.  Gibson also testified that he had changed his tour of duty three or four times after Arnold became his manager.  A.D. at 30.

---

[3]  In response to Defendant's motion for summary judgment, Plaintiff has supplied the Court with her closing argument from the official record of the administrative hearing, as well as a memo that Plaintiff wrote to Maggie Houston, the Agency's Acting Area Director, in July 2001.  Pl.'s Exs. 1, 11.  Both of these documents discuss Plaintiff's claims for discriminatory treatment of her duty hours and credit hours requests.  Neither of these documents, however, is competent summary judgment evidence, as they are unsworn and contain hearsay.  *See* Fed. R. Evid. 603, 802; Fed. R. Civ. P. 56(e).

However, Gibson did not alter the number of hours that he worked or the days that he worked, which, the evidence showed, did not create as much confusion as Plaintiff's requests.  A.D. at 38. Additionally, there is evidence that Arnold was concerned by instances in which Plaintiff worked from home without prior approval, left the office without informing Arnold's office, and worked more credit hours than she was allowed as a part-time employee.  A.D. at 31-32, 34.  Plaintiff has not shown that Arnold's treatment of her requests to change her duty hours was related to her gender in any way.

Plaintiff has failed to show that Arnold's behavior was based on gender, or even to raise a genuine factual issue to this effect.  Plaintiff has also failed to present any evidence that Arnold's behavior affected a term, condition, or privilege of her employment.   Furthermore, because Plaintiff has not shown that Arnold's behavior was based on gender, she has not shown any discriminatory conduct.  Without showing any discriminatory conduct, Plaintiff cannot possibly offer evidence that it was severe, physically threatening or humiliating, or that it unreasonably interfered with her work performance.  Plaintiff has therefore failed to make a prima facie case of a hostile work environment based on gender discrimination, and Defendant is entitled to summary judgment on this claim.

## C. Retaliation

To prove retaliation under Title VII by circumstantial evidence, Plaintiff must first establish a prima facie case by showing that: (1) she engaged in an activity protected by Title VII, (2) that an adverse employment action occurred; and (3) that there was a causal link between the protected activity and the adverse action.  *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001); *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003).  Once Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for its actions.  *Fierros*, 274 F.3d at 191.  If Defendant meets

this burden, then Plaintiff bears the ultimate burden of showing that the Agency's proffered reasons are a pretext for retaliation, by demonstrating that the adverse employment action would not have occurred "but for" the employee's participation in the protected activity.  *Id.*

Here, Plaintiff has met the first element of her prima facie case of retaliation, as she engaged in a protected activity when she filed an informal EEO complaint on August 27, 2001.[4] *See Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995) ("filing an administrative complaint is clearly protected activity").  Defendant contends, however, that the actions of which Plaintiff complains do not constitute adverse employment actions, and that Plaintiff has not raised a genuine issue of fact as to pretext for retaliation.

### 1. Ultimate Employment Decisions

The Fifth Circuit has construed the "adverse employment action" element of a retaliation claim in a "stricter sense" than other circuits, holding that only an employer's "ultimate employment decision" can provide the basis for a Title VII retaliation claim.  *Hernandez*, 321 F.3d at 531.  "Ultimate employment decisions include acts such as hiring, granting leave, discharging, promoting, and compensating."  *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (quotations and citations omitted).  The Fifth Circuit has found that the following actions do not amount to ultimate employment decisions:  refusing to allow an employee to attend a training conference, giving her incorrect information regarding work tasks, requiring her to get manager approval on her written work product, and criticizing her work to government vendors, *Dollis v. Rubin*, 77 F.3d 777, 779-81 (5th Cir. 1995); changing locks, restructuring office procedures, clarifying job duties, and issuing reprimands, *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002); assigning an employee to a less desirable shift and giving formal

---

[4] In her Complaint, Plaintiff characterizes her August 27, 2001 complaint as an "informal EEO Complaint," and Defendant's summary judgment motion indicates that while Plaintiff first contacted an EEO counselor in August 2001, she filed her formal administrative complaint in December 2001.  Defendant appears to assume, and the Court agrees, that Plaintiff's contact with the EEO in August 2001 constitutes a protected activity.

discipline, *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 394 n.2 (5th Cir. 2000); and changing work schedules and adding job tasks, *Watts v. Kroger Co.*, 170 F.3d 505, 511 (5th Cir. 1999).  Many of Plaintiff's claims of adverse employment actions are akin to those that the Fifth Circuit has held do not qualify as ultimate employment decisions.

First, Plaintiff's claim that Arnold denied her request to work flexi-place (from home) on a specific project is analogous to a scheduling or procedural matter, as the denial did not affect her pay, benefits, job title or responsibilities.  Here, the denial of flexi-place did not even affect the hours or the project on which Plaintiff worked, but rather, the location from which she worked. The refusal of Plaintiff's request to work on a project from home does not constitute an ultimate employment decision.

Second, Plaintiff's claim that Arnold referred her to the TIGTA for time and attendance violations is similar to claims arising from reprimands and formal discipline.  In fact, a referral for investigation and possible discipline is even less an ultimate employment decision than the actual meting out of discipline, which the Fifth Circuit has held is not an ultimate employment decision. *See Thomas*, 220 F.3d at 394 n.2.  Although such a referral may have increased the chance that Plaintiff would eventually suffer an adverse action, this is not enough to make the referral itself an ultimate employment decision.  *See Mattern*, 104 F.3d at 708.

Third, Plaintiff's claims that Arnold gave her low ratings on her Form 6850 and annual performance appraisals are also like those for reprimands or for criticism of an employee's work. Arnold's ratings, which were far from negative, had no effect on Plaintiff's benefits or job responsibilities and do not amount to an ultimate employment decision.  *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997) ("poor performance evaluation alone, even if undeserved, is not an adverse action for purposes of Title VII").

11

Finally, Plaintiff's claims that Arnold failed to postpone the conversion of her position to full-time until after the holidays, and that he failed to help her find another position with the Agency, are not in themselves ultimate employment decisions. While the conversion of Plaintiff's position to full-time may constitute an ultimate employment decision, as will be discussed, the failure to postpone the conversion until a more convenient time is akin to a scheduling change, which is not an ultimate employment decision. *See Watts*, 170 F.3d at 511. Similarly, although Plaintiff's compensation and job responsibilities may have been changed by the conversion, Arnold's subsequent failure to find her a new position did not in itself change her compensation or responsibilities, nor did it contribute to any change that may have already been caused by the conversion. Because all of the foregoing claims do not constitute ultimate employment decisions, they cannot form the basis for Plaintiff's retaliation claim.

Plaintiff does, however, point to two incidents that might qualify as adverse employment actions. First, the Fifth Circuit has found that the granting or denial of both paid and unpaid leave constitutes an ultimate employment decision. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 522 (5th Cir. 2001). Accordingly, Arnold's alleged refusal to permit Plaintiff to take leave without pay during the week of December 10-14, 2001 constitutes an adverse employment action. Second, Plaintiff claims in response to Defendant's summary judgment motion that Arnold's behavior, including his conversion of her position from full-time to part-time, resulted in her being forced to take a lower-ranking, non-supervisory position, and that it therefore amounted to a constructive discharge. The burden of demonstrating constructive discharge is a heavy one:

> To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. Stated more simply, [Plaintiff's] resignation must have been reasonable under all the circumstances. Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but [the Court] consider[s] the following factors relevant, singly or in combination:   (1) demotion; (2) reduction in salary; (3) reduction in job

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994) (citations omitted); *see also Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997).  Plaintiff also compares her situation to a voluntary transfer, which, the Fifth Circuit has found may constitute an adverse employment action, at least with respect to retaliation claims brought under Section 1983.  *Sharp v. City of Houston*, 164 F.3d 923, 933-34 (5th Cir. 1999).

Here, Plaintiff acknowledges that she was free to remain in her current position, albeit on a full-time schedule.  Plaintiff notes that Arnold "offered her two options, to return to a bargaining unit, non-supervisory position at a lower grade level or encumber the full-time management position with which he replaced her part-time position."  Compl. ¶ 14.  Moreover, aside from her allegation that the conversion of her position to full-time forced her to take a lower-level position, Plaintiff has offered no details to support her claims.  Plaintiff has not indicated what position she actually took after the conversion, nor has Plaintiff demonstrated the difference in grade level, compensation level, or job duties and responsibilities (if any) between the two positions. Additionally, Plaintiff has not shown that a reasonable person would have felt forced to transfer positions upon a conversion of the current position from part-time to full-time.[5]

Nevertheless, although the conversion of Plaintiff's position does not appear to amount to a constructive discharge, Plaintiff has shown that she was unable to work a full-time schedule because of her family responsibilities, and that she had made Arnold aware of this fact.  A.D. at

---

[5]  Additionally, although Plaintiff has presented evidence that Arnold yelled and was unpleasant to work for, these working conditions were not so intolerable that a reasonable employee would have felt compelled to resign.  Since the actions of which Plaintiff complains are not sufficient to support a claim of hostile work environment, Plaintiff cannot possibly show that they amounted to a constructive discharge.  *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) ("Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim.").

25.  Notably, after hearing evidence at the lengthy administrative hearing, the A.J. also appears to have regarded the conversion of Plaintiff's position to full-time as an adverse employment action. A.D. at 36 ("As to the retaliation charge, [Plaintiff] did show a prima facie case.  She has engaged in protected activity.  The acting official was aware of her activity.  She was told her position would be changed to full-time and she was not allowed LWOP.")  There is no need for the Court to decide this issue, however, because as will be discussed later in this opinion, even if the conversion did qualify as an adverse employment action, there is no evidence that the conversion would not have occurred "but for" Plaintiff's EEO complaint.

> ### 2. Causation

Plaintiff has shown that she engaged in protected activity under Title VII, and the Court will assume that both the denial of her LWOP request and the conversion of her position to full-time were adverse employment actions.  Still, she must also show that there was a causal link between these actions and her protected activity in order to make out a prima facie case of retaliation.  "A 'causal link' is established when the evidence demonstrates that 'the employer's [adverse employment] decision . . . was based in part on knowledge of the employee's protected activity.'"  *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines,* 132 F.3d 1112, 1122 (5th Cir. 1998)).  Courts have held that very close timing between an employee's protected activity and an employer's adverse action may be enough to establish the causal link element of a prima facie retaliation case.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

Here, Plaintiff alleges that she made her informal EEO complaint on August 27, 2001, and informed Arnold of the complaint on September 6, 2001.  Arnold notified her of his decision to return her position to full-time on October 27, 2001, less than two months after he learned of her EEO complaint.  It appears that Arnold reversed the approval of her LWOP request sometime in late November or early December 2001.  This was approximately three months after he learned of her EEO complaint.  Although the establishment of a causal link based on a two or three month gap is somewhat tenuous, the Court finds that Plaintiff has established a causal connection sufficient to constitute a prima facie case of retaliation.  As will be discussed, however, this is not enough to satisfy Plaintiff's ultimate burden of showing that Defendant's proffered reasons for the actions are mere pretext for retaliation, and that the actions would not have occurred "but for" Plaintiff's EEO complaint.

### 3. Proffered Reasons and Pretext for Retaliation

#### a. Denial of LWOP request

Defendant has articulated a legitimate, non-retaliatory reason for Arnold's denial of Plaintiff's LWOP request – that Plaintiff had leave available to take, and that it was inappropriate to grant LWOP in this situation.  A.D. at 36.  Plaintiff has failed to offer any evidence showing that this was pretext for retaliation.  At the administrative hearing, Arnold testified that Plaintiff had enough leave to take her requested time off over the holiday season without LWOP.  A.D. at 35.  Arnold also explained that Plaintiff's request did not fit into any of the situations discussed in a memo about when it was appropriate to grant LWOP, which the Agency had distributed to managers.  A.D. at 35, 40.  Arnold also testified that, although he had granted another employee, Lynn Langdale, LWOP, this was because she had no annual or sick leave to take instead.  A.D. at 35.  Similarly, both Susan Graham and Glenn Henderson also testified that employees would not be granted LWOP when they had leave available.  A.D. at 28, 34.  Plaintiff acknowledged that

Arnold told her that he disapproved her LWOP request because she had 240 hours of annual leave accumulated. A.D. at 27. The Court agrees with the A.J.'s conclusion that "the credible evidence is that it was [Arnold's] understanding at the time that the reason for [Plaintiff's] request was not what the [A]gency considered as a reason to grant LWOP. [Plaintiff] has not shown he denied this leave for a retaliatory reason." A.D. at 40-41. Plaintiff has failed to raise any genuine issue of fact as to pretext, and the denial of her LWOP request cannot support a claim for retaliation.

### b. Conversion to Full-Time Position

Defendant also articulated a legitimate, non-retaliatory reason for the conversion of Plaintiff's position from part-time to full-time, by its explanation that the position of group manager required a full-time effort. A.D. at 36. Although there is some evidence that not everyone agreed with this viewpoint, Plaintiff has not presented any evidence that a discriminatory or retaliatory animus motivated the decision to convert her position to full-time.

Many managers and employees within the Agency believed that group manager positions were necessarily full-time jobs. Arnold testified at the administrative hearing that he did not believe that anyone could be effective as a part-time group manager. A.D. at 35. Glenn Henderson likewise indicated that he had been surprised to learn that there was a manager working only part-time. A.D. at 33. Henderson testified that his experience showed that the position could not successfully be performed part-time. A.D. at 33. Susan Graham also testified at the hearing that managing a group requires more than forty hours of work per week, while Al Gibson opined that, when he had been branch chief, he would have looked with skepticism at a request to be a part-time manager. A.D. at 28, 30. Maggie Houston similarly testified that she would never approve a part-time work schedule for a first level supervisor. A.D. at 33. Shirley Wells likewise testified that there was only one part-time manager in Plaintiff's division nationwide, and that normally managers would not work part-time. A.D. at 33. Plaintiff noted that when she called

Dallas, she was told that no one in the Director's Office supports part-time work schedules for managers.  A.D. at 27.

In her response to Defendant's motion for summary judgment, Plaintiff alleges that inconsistencies in Henderson's testimony raise a genuine issue of fact as to pretext.  Plaintiff argues that while Henderson claimed that managers needed to be in the office to interact with employees, he also admitted that he had several subordinate managers who supervised employees in different locations than that of the managers, and that he had at least one manager with employees in nine different locations and in five different states.  Pl.'s Ex. 8.  Henderson conceded that these managers did not have frequent contact with their employees.  *Id.*  That there were some managers located far from their employees is not, however, contradictory to Henderson's opinion that managers should be full-time.  Henderson may well feel, like the many others who testified at the hearing, that management positions require more hours of work and attention than a part-time schedule would allow.  Henderson also indicated that full-time but long-distance managers may still be available to their employees by telephone or by traveling when necessary.  *Id.* (EEOC Hearing Transcript at 81).  Additionally, Plaintiff argues that Henderson was in her management chain previously, when he was the Assistant District Director in Houston for four years, and that he never voiced any concerns with her part-time status during this time.  Henderson testified at the hearing, however, that he had no knowledge or recollection that Plaintiff had been a part-time manager.  *Id.* (EEOC Hearing Transcript at 57).  Plaintiff has presented no evidence to rebut Henderson's prior lack of knowledge of her part-time position.  Plaintiff's assertions as to Henderson's testimony fail to raise any genuine issue of material fact as to pretext.

There was also some evidence produced at the administrative hearing that, while many within the Agency feel that managers should be full-time, all do not share this opinion.  Susan Wallace testified, for example, that she believes managers can be effective working part-time.

17

A.D. at 31.  Roland Gagne, Plaintiff's former manager, stated that he felt Plaintiff could handle two groups, even part-time.  A.D. at 28.  James Clarkson similarly testified that he had no problem with Plaintiff's working part-time because she accomplished more than other managers did while working full-time, and Leanna Cantu testified that Plaintiff's being part-time did not cause her to lose any working time.  A.D. at 29.  At best, these witnesses call into question the wisdom of the Agency's view that managers need to work full-time.  Making unwise decisions, without more, is not evidence of pretext for discrimination or retaliation.  *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.").

Finally, it appears that the conversion of Plaintiff's position to full-time was a likelihood that Arnold had anticipated and discussed with Plaintiff prior to her filing an EEO complaint. Plaintiff admitted that Arnold first brought up Plaintiff's part-time schedule with her in August 2001.  A.D. at 26.  At this time, Arnold informed her that there would be another round of hiring, and that there would be a need to convert her position to full-time.  A.D. at 26.  This occurred prior to Plaintiff's informing Arnold of her EEO complaint on September 7, 2001.  While Plaintiff claims that the hiring round had been postponed, and that she would have received new hires in June 2002 at the earliest, Arnold testified that he wanted Plaintiff to be back at full-time status prior to the arrival of the new hires.  A.D. at 27, 34.  That Arnold did not withdraw his existing plans to make Plaintiff's position part-time after he learned of her EEO complaint does not show pretext for retaliation.  *See Clark County*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previous contemplated, though not yet definitively determined, is no evidence whatever of causality.")

Plaintiff cannot meet her ultimate burden of showing that Defendant's legitimate reasons for denying her LWOP request or for converting her position to full-time are a pretext for retaliation, nor has Plaintiff raised any genuine factual issue as to pretext. Therefore, Plaintiff is unable to succeed on her claim of retaliation, and Defendant is entitled to summary judgment.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**

    **IT IS SO ORDERED**.

    **SIGNED** this 20th day of March, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.